# ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP
Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

Franklin A. Rothman
Jeremy Schneider
Robert A. Soloway
David Stern

Fax: (212) 571-5507
Tel: (212) 571-5500

October 12, 2022

BY ECF

Hon. Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: United States v. Rashawn Assanah
        Ind No.: 21 Cr. 351 (CM)

Dear Judge McMahon:

     I represent Rashawn Assanah in the referenced matter, who will appear before your Honor for sentence on October 26, 2022. Mr. Assanah is pending sentence following his guilty plea to conspiracy to commit bribery and honest services wire fraud in violation of 18 U.S.C. § 371, and substantive bribery in violation of 18 U.S.C. §§ 666(a)(1)(B). I have discussed the January 14, 2022 Revised Pre-Sentence Report of Probation Officer James Mullen (the "PSR") with my client, and, other than as specifically set forth herein, there are no objections to the factual recitations or Sentencing Guideline calculations contained therein. The revised information in the PSR concerns fabricated statements my client made to the Probation Department and his former attorney to the effect that he had been diagnosed with a serious medical condition. In the plea agreement in this case, the parties had stipulated that the applicable Guidelines sentencing range would be 18–24 months imprisonment, but those calculations have changed due to the events which precipitated the PSR revision, and the revised sentencing range is 33-41 months. (PSR ¶ 91)

     This letter, and the eight letters of family and friends attached hereto, are submitted in support of Mr. Assanah's request for a sentence of no more than six months imprisonment -- a downward variance to the same principal sentence that was imposed by Hon. Paul Engelmayer upon Miguel

Compres, one of nine New York City Department of Corrections ("DOC") employees arrested on May 26, 2021 (which group included Mr. Assanah) based on a law enforcement smuggling investigation targeting DOC employees. Letters are submitted from Mr Assanah's sister, Stansiha Houslin, as Exhibit A; his father, Frederick Assanah, Exhibit B; and his mother, AnneMarie Westmoreland, as Exhbit C. The other five letters from co-workers and friends are collectively annexed as Exhibit D.

## I. INTRODUCTION

On October 22, 2021, five months after his arrest, Mr. Assanah pled guilty in this matter, paving the way to earn acceptance of responsibility credit at the time of sentence. Thereafter, he lied to the Probation Department at the pre-sentence interview -- and later to his own lawyer as well -- claiming in both instances to have been diagnosed with cancer. He also presented a forged medical letter to his counsel to "corroborate" the fabricated diagnosis when the government insisted upon receiving proof of the claimed illness.

It is respectfully submitted that notwithstanding the very serious offense conduct in this matter, and the subsequent obstruction, a sentence of no more than six months custody still satisfies the sentencing goals of 18 U.S.C. § 3553(a).

That is true for many reasons. First, despite his fabricated account of a medical condition he does not have and the resultant substantial elevation of his sentencing Guidelines range, Mr. Assanah is genuinely remorseful for his crimes, and accepts factual and moral responsibility for committing them whether or not such personal acceptance entitles or does not entitle him to legal "acceptance of responsibility" pursuant to U.S.S.G. 3E1.1 of the Sentencing Guidelines, and the accompanying legal framework. Indeed, the reality of what his obstructive conduct evidences more than anything is raw terror over the prospect of being sentenced to prison, combined with astoundingly poor judgment and immaturity in failing to cope with that terror.

Importantly, Mr. Assanah is unlikely to violate the law again. He will clearly never work as a correctional officer following his conviction in this case. And despite his obstruction, he has found new full-time employment at which he is fulfilled and successful, and has been open and honest with his family and close friends about what he did. They are there for him as he builds a different life for himself.

Finally, the sentence requested is consistent with sentences imposed on similarly situated offenders. Indeed, but for his acts of obstruction, Mr. Assanah's sentence would very likely have been non-custodial since virtually every similarly situated defendant to face the Court who was arrested in the instant investigation has received a non-custodial sentence, with the exception only of the two offenders who smuggled weapons into the jail. And even those two offenders, Miguel Compres and Robert Balcucci, received sentences of imprisonment of six and ten months, respectively.

## II. MR. ASSANAH'S BACKGROUND AND CHARACTERISTICS

### A. Work, Family, and Law Enforcement Career Goals

Mr. Assanah was raised in New York City by two working parents. His father is an electrician who worked for the New York City Housing Authority, but no longer works due to health problems. His mother is a school bus driver. He had a childhood which was not deprived, nor characterized by abuse, drug addiction, or food or housing insecurity.

As a young boy and adolescent, Mr. Assanah hoped to work in law enforcement. He completed high school at Windgate High in 2014, and earned an associates degree in criminal justice at Monroe College in 2018. (PSR ¶¶ 72-73) He took several New York City law enforcement exams over a period of time while working toward his associates degree, and was contacted by DOC with a job offer when he was only twenty years old. He accepted the position. When enrolled in the DOC Training Academy, he reports being the youngest recruit in his class. His employment with DOC began in June 2017 (PSR ¶ 79), and he believed that it was for him the beginning of a lifelong career in law enforcement. That, of course, is no longer the plan.

Mr. Assanah worked steadily throughout his life, even as a teenager while attending and completing secondary school. He has worked as a security guard, and at seasonal employments for United Parcel Service. (PSR ¶¶ 75-76) Before his employment at DOC, he worked for Mercy Drive, Inc., a non-profit agency which delivers assistance to the developmentally disabled so they may reside independently outside of hospitals and care centers. (PSR ¶ 78)

Additionally, the letters of his loved ones establish the devastating impact this case is taking on Mr. Assanah, and on them. His mother is physically ill from worry, and cries thinking about the plight of her son. She notes he helps her with her mortgage payments with the salary he earns at Bloc

Power, but overall, his emotional condition is clearly worrisome:

> Your honor, sentencing would not only hurt Rashawn but this will break all of us ... I feel affected by all of this so much because my son just isn't like this. This isn't the Rashawn I birthed. He always told the truth to his father and I. I noticed that he seems a lot more quiet and depressed from all of this. I have never in my life seen Rashawn so depressed and anxious over anything so much.

Ex B, at p. 2.

Now, having been terminated from DOC, Mr. Assanah is working for Bloc Power, a Brooklyn based technology company. He has been employed with the company for eleven months. Pay stubs reflect that he earns $20.00 per hour (although his hourly wage has been recently raised to $27), and he resides with his mother in her home in Jamaica, Queens. Some of his electronic pay records are annexed collectively as Exhibit E. Before working at Bloc Power, he worked in November 2021 as a security guard for Universal Protection Services, as reflected by his pay stub for the period November 12, 2021 - November 18, 2021, annexed as Exhibit F, and as also referenced in the PSR. (PSR ¶ 82)

He has a very close relationship with both of his parents, and several of his siblings.

### B. Current Employment with Bloc Power

Mr. Assanah's employment with Bloc Power is going very well. Bloc Power is a company which seeks to upgrade HVAC and other mechanical systems in aging buildings to more modern and climate-friendly systems and technologies.

The company was started by Donell Baird, a Brooklyn native whose projects have been described in many media outlets, including *Forbes*, *Axios*, the *New York Times* and Time Magazine. The company is billed as a "climate technology company." Its projects involve retrofitting old buildings with solar panels, electric heat pumps, and other green technologies that in the long run lower energy bills and reduce planet-warming emissions. In addition, Bloc Power encourages and assists building owners to access government funding sources they may not know are available to them, which helps them contract for Bloc Power installations which will save them money in the long run, and be more efficient and environmentally friendly.

I recently spoke by phone with Eric Montilla, a Bloc Power Construction Manager who is

currently Mr. Assanah's immediate supervisor. He described the company's mission as working to "de-carbonize" and electrify buildings by replacing oil as their primary heating source with electric heat pump alternatives. It operates at times, though not always, in distressed communities, including by meeting with the owners and managers of churches and schools which often operate within aging structures with outdated systems, and encourages those organizations and groups to modernize and to pursue funding to do so with programs which can make the projects affordable.

Mr. Montilla informed me that Rashawn Assanah is one the best members of his eight member team. He described him as a highly motivated worker who is doing a great job for the company, is reliable, excited to learn, and gets along well with others. He informed me that Mr. Assanah recently received a "Member of the Year" award from the company as he is now approaching his one year anniversary. The award acknowledges an employee's hard work and dedication where it is identified. A copy of the Certificate which Mr. Assanah was awarded is annexed as Exhibit G.

Mr. Assana began with the company doing installations of dry wall and HVAC systems, but is now managing and executing floor plans for the Montilla teams' projects, which provide contractors with the company's plans for how and where equipment will be installed. Mr. Montilla is aware that Mr. Assanah has an open criminal case, and is hopeful the matter resolves well for him and he does not have to lose him from his team.

As noted, Mr. Assanah started with the company earning $20 per hour and now earns $27. He works full time. He visits locations in the field at which the company has ongoing projects, and participates in planning the system renovations and upgrades from oil based heating systems to electric. He draws floor plans for the company's renovation jobs which locate the energy systems installations.

### III.   OFFENSE CONDUCT: SMUGGLING CIGARETTES, ONE CELLPHONE, AND, ON ONE OCCASION, K-2

*A. The Defendant's Underlying Offense Conduct*

Mr. Assanah's offense conduct consists of involvement with two inmates with whom he engaged in corrupt relationships while a DOC officer, Alex Nunez and Shaquilie Yorke. His smuggling for Nunez was short-lived and involved exclusively the smuggling of cigarettes for approximately one month in 2019. His relationship with Yorke was more extensive and longer in

5

duration. It involved smuggling large amounts of cigarettes, one cellphone, and, on one occasion, a package containing the synthetic cannabinoid K-2. The K-2, however, when delivered, was packaged in an opaque wrapping which Mr. Assanah was told contained tobacco; and only after its delivery did he learn the true nature of its contents.

Mr. Assanah supplied cigarettes to Alex Nunez approximately 3 to 4 times in September 2019 in return for bribe payments. He terminated the corrupt relationship after approximately one month, at which point he informed Nunez he would not continue, and the deliveries stopped.

Approximately one year later, beginning November 2020, Mr. Assanah began smuggling contraband to inmate Shaquillie Yorke. These deliveries were effectuated through contacts Mr. Assanah had with the inmate, the inmate's wife, and, on one occasion, with a male contact who met him in the community and provided a package wrapped in black tape for delivery to Mr. Yorke, which Mr. Assanah snuck in and delivered.

Mr. Assanah knowingly delivered a large number of cigarettes and one cellphone that he received from the inmate's wife to Yorke in return for a cash payment. As noted, on one occasion he also delivered K-2. The K-2 delivery occurred in about January 2021. After Mr. Assanah had made several cigarette deliveries to inmate Yorke, the inmate requested another. Mr. Assanah told him he did not have any money at the time, and it would have to wait. Instead of accepting this response, Yorke provided contact information for an associate of his on the street who he said would purchase and package the cigarettes, and that Mr. Assanah could just pick up the package and bring it to him without buying the cigarettes himself. Mr. Assanah assented. He met the contact at an agreed upon location in Brooklyn, and received a soft package wrapped in black tape which he was told and believed contained either loose cigarettes, or loose tobacco. A day after delivering the package, however, he learned it had actually contained K-2. The reason he came to learn this fact is that one day after he delivered the black-taped package to Yorke, the latter asked him to provide cigarettes again. When Mr. Assanah replied that he had just delivered cigarettes the day before, Yorke informed him that the package he brought in from the street actually contained "paper plane," a slang term in the jail for K-2.

After that occurrence, Mr. Assanah never retrieved a package from the street for delivery into the jail again, but always purchased tobacco himself to avoid smuggling drugs into the jail, and to

avoid being deceived about the contents of a package, as he had been by Yorke's contact. And to be clear, he never knowingly smuggled K-2 into the facility.

The smuggling to Yorke continued until on or about February 26, 2021, the date on which Mr. Assanah was met at his employment by investigators from the Department of Investigation ("DOI") and interviewed about his corrupt contacts and relationship with Yorke and the latter's family members. (PSR ¶¶ 16-18)

### B. Corrections to Offense Conduct Wrongly Stated in the PSR

The February 26, 2021 interview by DOI investigators is described in the PSR and contains information that is at times either incorrect, vague, or incomplete. (PSR ¶¶ 16-18)

Upon arriving at his post on that date, Mr. Assanah was met by such investigators who interviewed him about his smuggling activities. He told them, as reported in the PSR, that he gave cigarettes to inmates in return for payments which were substantially larger than the cost of cigarettes on the street. (PSR ¶ 17) While Mr. Assanah told the investigators he smuggled cigarettes for one "Bobby," and these PSR statements accurately recount what he said, statements to DOI about "Bobby" were knowingly false when Mr. Assanah made them because at that early point in the interview, he did not want to reveal that his smuggling activity was actually for Yorke.

The PSR recites that "according to Assanah, on one occasion he received payment to obtain K-2 for Yorke." (PSR ¶ 17) While it is true Mr. Assanah did state that he received payment to obtain K-2 for Yorke, it is not true that he knew the subject package contained K-2 until after the delivery, and in his mind, he was paid for delivering tobacco, not K-2. To the extent these statements by Mr. Assanah purport to be admissions to DOI that he knowingly smuggled K-2 to Yorke, and although he does not remember the DOI interview word for word, the K-2 references are not what was communicated to DOI as to Mr. Assanah's state of mind, even if DOI intends to report them as admissions as to what he knew or intended. He made no such admissions as to knowledge, but did report the fact that he delivered K-2 to Yorke on one occasion, because it is true that he did.

The DOI interview as reported in the PSR also incorrectly reports matters relating to scalpel blades. It reads, "Yorke had requested scalpel blades, but Assanah was afraid the blades would set of the magnetometer." (PSR ¶ 18)   That is an entirely incorrect recital of the interview portion involving scalpel blades. An accurate account is that DOI asked Mr. Assanah if Yorke ever asked

7

him to bring in weapons or cutting instruments, and if he ever did so. Mr. Assanah responded affirmatively when asked whether Yorke asked him to do it, and that portion of the interview is accurately reported in the PSR. But his response to DOI regarding the magnetometer is completely misstated. Mr. Assanah did not tell the DOI investigators that he declined to smuggle in blades for Mr. Yorke because he, Mr. Assanah, was afraid the blades would set off the magnetometer. Rather, he told them he gave that reason to Yorke as to why he was unwilling to bring blades in. These statements, and their underlying meaning, are entirely different.

The fact is that Mr. Assanah never brought blades or any weapons into the jail, and was always unwilling to do so. He was unwilling because it was a line he was unwilling to cross to bring in weapons, not because he was afraid they would set off the magnetometer.

Thus, to the extent DOI seems to have reported to United States Probation that the reason Mr. Assanah gave DOI for not smuggling blades into the jail was his fear they would set off the magnetometer, that is an inaccurate recital of what Mr. Assanah told DOI.

Technically, these are not objections to what is reported in the PSR, as the defense has no knowledge of what was told by DOI to the Probation Department. But it is an objection to DOI's mis-characterization of this portion of the February 26, 2021 interview.

## IV. AVOIDING DISPARITIES TO ACHIEVE A FAIR OUTCOME

### A. The Pertinent Prior Sentences Imposed on Similar Offenders

On May 26, 2021 the government unsealed separate indictments charging nine New York City Department of Correction employees with taking cash bribes in return for smuggling contraband to inmates in City jails (hereinafter, the "DOC Employees"). All were arrested that day. Among them, and by far the youngest at 25 years of age, was Rashawn Assanah.

Seven of the nine offenders have now been sentenced with the lone exceptions being Mr. Assanah and Jasmin Reed, whose sentence is scheduled for November 4, 2022 before Hon. Ronnie Abrams.

Of the seven, *each and every one of them has received a sentence of time served* -- effectively non-custodial sentences since all of them were released on bail conditions at presentment. As noted, the only exceptions were the two offenders who smuggled weapons into the jails, specifically razor blades and scalpels. In those two cases, Robert Balducci received a sentence of ten months

imprisonment from Judge Berman (*United States v. Balducci*, 21 Cr. 355); and Miguel Compres was sentenced principally to six months imprisonment by Judge Engelmayer *(United States v. Compres*, 21 Cr. 352).

Rashawn Assanah did not smuggle weapons into jail .[1]

It is respectfully submitted that fixing an appropriate sentence in Mr. Assanah's case cannot be fairly accomplished without close consideration of the previously adjudicated DOC offenders already sentenced (and similarly situated offenders in other investigations) and performing the complex comparison as to how those cases resemble and differ from the case before the Court. In this case, such a comparison unequivocally supports a substantial downward variance from the 33-41 month Guidelines sentencing range despite the powerfully negative impact of Mr. Assanah's astoundingly ill-advised post-guilty plea obstruction conduct.[2]

I propose to examine in some detail the proceedings which relate to two of the DOC Employees, Miguel Compres and Tameka Lewis, and how their cases impact that of my client.

### B.  United States v. Miguel Compres, 21 Cr. 352 (PAE)

On May 26, 2021, the United States Attorney's Office for the Southern District of New York issued a press statement announcing the arrest and indictments of the DOC Employees, and detailing their basic offense conduct (the "SDNY Press Release"). It described Compres as an officer who smuggled, "scalpels, smokeable synthetic cannabinoids [K-2], cellphones, and large quantities of cigarettes into the Manhattan Detention Complex ... from at least in or about November 2019 up through and including in or about August 2020."

Thirty-five years old when charged, Compres pled guilty on November 4, 2021, just over 5

---

[1] For completeness, it must be noted that Temaine Pelzer was sentenced to time served by Judge Furman, with the first 3 months of his two year supervised release term to be served on home confinement (21 Cr. 348); Johnathan Garrett received three years supervised release from Judge Caproni, the first 6 months to be served on home detention (21 Cr. 354); and Judge Buchwald sentenced Dariel Diaz to time served, and ordered him to complete 350 hours of community service during his 3 year supervised release term (21 Cr. 350).

[2] With regret, this writer must endorse Probation Officer Mullens' characterization: "The defendant's post-plea conduct is abhorrent. Malingering cancer is a truly ugly act." (PSR. Sentencing Recommendation, at p. 25)

9

months after his arrest. Like Mr. Assanah, and the majority of the DOC Employees, he had never been previously arrested, prompting his attorney to opine, "there is zero indication that he is a person capable of repeating his conduct, nor will he." [Defense Sentence Submission, 21 Cr. 352, Document 34, at 3]. Compres graduated from SUNY Farmingdale College with a Business Management degree, and "grew up in a working middle class family in Manhattan." [*Id*. at 6-7] At the time of sentence, he was married, the father to a three year old son (and by all accounts a loving and attentive parent), and the breadwinner of the family, having moved on from the loss of his DOC career to full time employment at a Home Health Care facility, but also "looking forward to using his skills and talents in a more rewarding manner in the future." [*Id*., at 22] His attorney requested a time served sentence. [*Id*., at 22]

  The parties agreed the advisory Guidelines sentencing range was 18-24 months. The government asserted in its sentencing submission that in return for an estimated $10,000 in bribes, Compres had smuggled scalpels, cigarettes, marijuana possibly laced with K-2, and cellphones to three separate inmates where he worked. [Gov't Sentence Submission, 21 Cr. 352, Document 35, at 1-2] It noted that he admitted in an interview with law enforcement that he smuggled cigarettes for three additional inmates, information evidently otherwise unknown to the government. The government characterized Compres' scheme as "far-reaching" in terms of its length of time and the number of inmates served. It supplied to the Court a photograph of scalpel blades and marijuana recovered in an inmate's cell who had received contraband from Compres', and claimed the photograph "corroborated" Compres' admissions. The photograph is annexed as Exhibit H.

  The government recommended a term of "at least six months' imprisonment," and that is the principal sentence Judge Engelmayer imposed. ("[T]he government submits that a substantial term of imprisonment -- no less than the term of six months' imprisonment recommended by the Probation Department -- would adequately reflect the gravity of the defendants' offense and otherwise serve the ends of sentencing.") [*Id*., at 1] It argued such a sentence would "appropriately reflect[] the serious nature of the defendant's conduct, promote[] respect for law, and afford[] adequate deterrence to similar illegal activity." [*Id*., at 4] The government also noted that following his arrest, Mr. Compres voluntarily met with the government and "provided information concerning his involvement in the smuggling activity." [*Id*., at 5] The information led to no further prosecutions and

did not constitute substantial assistance, but the government "notes the defendant's voluntary efforts to assist law enforcement."[3] [*Id.*, at 6]

### C. United States v Tameka Lewis, 21 Cr. 349 (JSR)

Ms. Lewis was a counselor who worked at the Otis Bantum Correctional Center ("OBCC"), one of the jails on Rikers Island. States the government's sentencing submission:

> The defendant ... [from at least in or about June 2019 through in or about September 2020] accepted cash payments totaling approximately $44,300 in exchange for smuggling various contraband -- including the synthetic cannabinoid known as K-2 -- to three inmates ... On September 18, 2020, Lewis attempted to enter work at the OBCC with nearly fifty sheets of K-2 soaked paper.

[Gov't Sentence Submission, 21 Cr. 349, Document 27, at 1-2]

The government labeled Ms. Lewis' narcotics smuggling scheme "enduring and also far-reaching, involving various family members and associates of three inmates." [Id., at 3] Ms. Lewis's advisory Guidelines sentencing range was 37-46 months due largely to the narcotics charge and the value of the bribes she received. The government noted that the two DOC defendants' sentenced to that point, Dariel Diaz and Johnathan Garrett, had received sentences of time served, and took note of the Probation Office recommendation of a 37 month sentence for Ms. Lewis. The government did not endorse that recommendation, but stated that Ms. Lewis should receive "a substantial sentence to include a term of imprisonment" and elsewhere, called for a sentence of "some term of incarceration below the [37-46 month] Stipulated Guidelines range." [Id., at 2,4]

Judge Rakoff sentenced Ms. Lewis to three years probation.

### D. Mr. Assanah's Case After the Obstruction Has Materially Changed, But he Still Should Receive a Dramatic Downward Variance

The sentences of Mr. Compres and Ms. Lewis particularly, but also the entire universe of sentences imposed upon the DOC Employees, strongly counsels in favor of a sentence in the instant

---

[3] It bears mention that Mr. Assanah also participated in a proffer session with the government, convened August 5, 2021, two months prior to the entry of his guilty plea. He furnished to the government at that meeting all information he possessed regarding his own criminal conduct, and that of others he was aware of. In light of his recent post-guilty plea obstruction, the government is unwilling to regard his proffer as credible, even though nothing Mr. Assanah specifically proffered at the meeting is known at this time to the government to be untrue.

11

case no greater than that imposed on Mr. Compres by Judge Engelmayer. That is because despite the post-guilty plea obstruction, the sentence imposed in this case should depend more heavily upon the defendant's offense conduct than anything else -- even including the troubling post-guilty plea obstruction born of Mr. Assanah's panicked reaction to the possibility he might go to prison.

Moreover, conceding that the post-guilty plea obstruction is material is not the same as agreeing that Mr. Assanah forfeits any right to a downward variance from the revised sentencing guideline range -- including even a very significant one if warranted by sufficiently consequential case facts and circumstances. And that is exactly the case here.[4]

Indeed, acknowledgment by Judge Rakoff of the appropriateness of a probationary term for Ms. Lewis in the face of her extensive and lucrative narcotics dealing to inmates serves to underscore the relevance of her sentencing case -- founded upon her very difficult circumstances growing up in an abusive and neglectful home -- to the Court's sentencing decisions. It is respectfully submitted that had Mr. Assanah (wisely) proceeded to sentence without fabricating a medical diagnosis and forging a doctor's letter, he would have comfortably resided factually within the group of DOC Employees who received non-custodial sentences from five separate judges of this Court. That is especially the case when two DOC Employees who smuggled weapons and larger amounts of other contraband than Mr. Assanah received sentences of ten and six months incarceration, respectively.

It is further respectfully submitted that Mr. Assanah's sentencing case should not be forfeit in its entirety by his post-guilty plea obstruction, and that a sentence to more than six months imprisonment would be one greater than necessary to satisfy the goals of federal sentencing in his

---

[4] Counsel has not found support in case law or the Guidelines to challenge the PSR's conclusion that post-guilty plea fabrication of serious illness, and forging a doctor's letter in support of the fabrication to secure a better sentence, constitutes obstruction of justice. Nor has case law or Guidelines support been found to support arguments that the defendant is entitled to acceptance of responsibility credit on the basis that his case is "extraordinary" such that the offender may receive acceptance of responsibility credit despite the obstruction of justice. *See*, *United States v Teyer*, 322 F.Supp.2d 359, 368 (SDNY 2004)("To be sure, obstructive conduct closely related in time to the defendant's guilty plea – and, without question, any such conduct perpetrated after the plea – might well establish that a defendant did not truly accept his guilt and persisted in his criminal activities."); *United States v Kumar*, 617 F.2d 612, 636 (2d Cir. 2010)(""[A]n examination of the record shows that [Kumar] engaged in sufficient objectionable post-indictment conduct to justify a rejection of his request for acceptance of responsibility credit.")

case. Stated simply (and respectfully) another way, the sentences imposed on the other DOC Employees would render a sentence greater than six months imprisonment for Mr. Assanah an unwarranted disparity.[5]

## V. Mr. Assanah Despite All That Has Happened is Intent on Making Better Choices in the Future.

Rashawn Assanah, now 26 years old, is remorseful for committing the very serious crimes of conviction. Importantly, he still has many supportive and loving family members and friends who are concerned for his well-being and future, and many have written letters to the Court to this effect. And although he has suffered hardship and humiliation throughout the pendency of this case, he well knows such consequences are the product of his own severe lapses in both judgment and duty. He is grateful all of his errors have in no way diminished the significant support he has been shown by family and friends, who are there for him no matter what befalls him at sentence. Both of his parents have been in regular contact with me throughout the case, and their concern for their son's well-being and growth is strong. Further, he can count on such support when the case is over and he must move forward.

Mr. Assanah has obviously taken the actions that put him before this Court, and the enormous toll his DOC job took on him is not an excuse. He lost his job and his reputation. Laudably, he has

---

[5] It bears noting that the DOC Employee cases are not the only law enforcement investigations to result in federal prosecution of corrupt New York City Correction officers and employees. An Eastern District of New York prosecution now winding down (a review of the docket discloses that only one of the original ten cases remains open) involves charges similar to those in the instant matter. In the EDNY matter, 20 Cr. 71, Correction Officers Darrington Jones, Aldrin Livington, Michael Murray, and Christopher Walker were all sentenced for smuggling contraband into Rikers Island jails in concert with family members of the inmates. Of the four, only Mr. Murray received a sentence of imprisonment, and that appears to have resulted mostly due to new arrests he sustained for firearms and narcotics offenses committed while on bail release in the smuggling case. In a separate EDNY matter, *United States v. Rodriguez*, 20 Cr. 065, DOC correctional officer Angel Rodriguez was charged with smuggling marijuana and synthetic cannabinoids into the jails on Rikers Island in which he worked. Hon. Edward R. Korman sentenced Mr. Rodriguez on July 21, 2021 to a three year term of probation, the first fifteen months to be served on home detention, and 200 hours of community service. [*See*, Judgment, *Rodriguez*, 20 Cr. 065, Document 109).

managed to find work in a field he truly enjoys and in which he is thriving and happy, unlike the stressful work experiences he endured during the pandemic at DOC. It is respectfully submitted that given all of his circumstances, Mr. Assanah does not require a prison sentence in the range of 33-41 months to be deterred or punished in this matter, because he already is.

### VI. The Sentencing Guidelines are Advisory and Under All the Circumstances, the Just and Reasonable Sentence is Substantially Below the Sentencing Guidelines Range

Pursuant to specific statutory direction, the federal court must impose sentences which are sufficient "but not greater than necessary" to achieve the federal statutory sentencing purposes of just punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a). And while the sentencing guideline range in this matter is 33 - 41 months, *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), makes clear that the history and characteristics of the defendant as well as the offense and the guideline range should all be carefully considered by the sentencing judge:

> Prior to *Booker/Fanfan*, the section 3553(a) requirement that the sentencing judge 'consider' all of the factors enumerated in that section had uncertain import because subsection 3553(b)(1) required judges to select a sentence within the applicable Guidelines range unless the statutory standard for a departure was met. Now with the mandatory duty to apply the Guidelines excised, the duty imposed by section 3553(a) to 'consider' numerous factors acquires renewed significance.

*Crosby,* 397 F.3d at 111.

Pursuant to *Booker/Fanfan*, the sentencing judge now has a duty to determine the sentencing guideline range, and to "'consider' it along with all of the factors listed in section 3553(a)." *Crosby,* 397 F.3d at 112.

In this regard, it is respectfully submitted that Mr. Assanah's relative youth; lack of prior criminal history; strong support of family and friends; and the disparity in sentence that will exist if he receives a Guidelines (or even near-Guidelines) sentence; all combine to strongly support a prison sentence in this matter, if one is imposed at all, not greater than six months in length.

Thank you very much for your attention.

Sincerely,

*Robert A. Soloway*

Robert A. Soloway

cc: AUSA Margaret Colson
    (by ECF)
RAS:sc